Filed 1/11/21; Certified for Publication 2/1/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| KIEU HOANG,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>PHONG MINH TRAN,<br><br>  Defendant and Appellant. | 2d Civil No. B302608<br>(Super. Ct. No. 56-2018-<br>00507910-CU-DF-VTA)<br>(Ventura County) |

   Phong Minh Tran appeals from an order denying his special motion to strike respondent Kieu Hoang's complaint as a strategic lawsuit against public participation (SLAPP). (Code Civ. Proc., § 425.16.)[1]  Respondent sued appellant for defamation and other torts.  Appellant contends that the trial court erroneously determined that he had failed to satisfy the first prong of the anti-SLAPP statute, i.e., he had not made a threshold showing that respondent's action arose from protected activity in connection with an issue of public interest.  Appellant

---

   [1] Unless otherwise stated, all statutory references are to the Code of Civil Procedure.

further contends that the trial court erroneously determined that respondent had satisfied the statute's second prong, i.e., respondent had demonstrated a probability of prevailing on his claims. Therefore, appellant argues that the trial court should have granted his anti-SLAPP motion and struck respondent's complaint. We agree and reverse.

*Factual and Procedural Background*

In May 2018 respondent filed a first amended complaint (the complaint) against appellant, BBC Global News and related entities (BBC), and Nguyen Huy. The complaint alleged three causes of action against all defendants. The first was for defamation. The second was for a violation of the common law right of publicity. It alleged that defendants' "[d]efamatory [s]tatements . . . are calculated falsehoods . . . and . . . a cover-up or subterfuge for the unauthorized commercial appropriation of [respondent's] name, image and identity . . . ." The third cause of action was for civil conspiracy. It alleged, "Defendants acted in concert and came to a mutual understanding . . . to accomplish a common and unlawful plan to defame [respondent] and misappropriate his name, image, likeness, and identity for their advantage . . . ." Respondent claimed that, because of appellant's "false and defamatory statements about him," his "estimated net worth" had decreased by approximately $1 billion. He "suffered lost business opportunities, including . . . a cancelled $6 billion . . . transaction for a sale of [his] shares of Shanghai RAAS stock."[2]

---

[2] Plaintiffs in SLAPP suits "'typically ask for damages which would be ruinous to the defendants.[']" (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 891.)

2

The complaint stated: "[Respondent] is a remarkable success story. He was born in Vietnam. He immigrated with his family to the United States in 1975, as the last of the American troops were pulling out of the country. He began work in the U.S. as a technician, earning $1.25 per hour. By 2015, [he] was a self-made billionaire, with a net worth of $3.8 billion, ranking No. 149 on the *Forbes* 400 list." Appellant cofounded and is the second largest shareholder of Shanghai RAAS, "the largest producer of human blood derived products in China and Asia." In the United States he founded "RAAS Nutritionals LLC . . . , which is involved in the research, development and marketing of a range of nutritional aids and health products." In addition, he founded "an internationally-based beauty company offering scientifically advanced skin care products for men and women." The company "also offers Italian crafted luxury fashion wear and accessories." He owns a winery and vineyards in Napa valley. He "has been steadily building a reputation in the Napa Valley wine industry with his signature Kieu Hoang [respondent's name] wines."

Respondent's causes of action arose from an article about him that appellant had written in Vietnamese (the article). Appellant declared: "I am a filmmaker and a blogger who comments on public affairs in Vietnam. I have occasionally contributed to the BBC Vietnamese Service." "I came to Orange County from Vietnam in 1993."

In February 2018 appellant posted the article on Facebook. At the end of the article, appellant included three photographs of respondent. Several days later, the article and photographs were republished "on the BBC Vietnamese Facebook Page." The complaint alleged that, "[a]s of January 2018, the BBC

3

Vietnamese Facebook Page had millions of readers . . . and was 'followed' by 2,055,443 internet users."

As an exhibit to the complaint, respondent attached an English translation of the article and 243 pages of comments to the article.  The title of the article is "Hoang Kieu [respondent] and 'A Sickening Culture.'"  Respondent filed a declaration identifying the allegedly defamatory statements in the article.  These statements include the following:

1. "Since the [19]90s, [respondent] has flown to Shanghai, imported blood from China, then provided it to a number of large hospitals in the U.S., and he has thereby become a 'billionaire'."  Respondent protested, "With my Chinese partners, I founded Shanghai RAAS in 1988, which produces human albumin and human blood-derived medicinal products.  [¶] . . . I have never imported blood from China into the United States or supplied blood to hospitals [there].  To do so, would have been a serious violation of the Code of Federal Regulations, Title 21 and a criminal act . . . .  All of the blood-derived medical products that my company has obtained from China do not get shipped to the United States."  "For the Article to [falsely] state that I made my fortune from such illegal activity, is . . . tremendously damaging to me, both personally and professionally, including in my business."

2. "Throughout the period of more than 20 years doing business in China, during several subsequent trips to Viet Nam, [respondent] was enticed by acquaintances and government officials to invest several millions dollars (perhaps 6 million USD).  His investment was eventually wiped out, he had to run back to the U.S., and vowed to never make investment in Viet

4

Nam, only to go there for fun, although he still had some houses in Vietnam that weren't . . . taken over."

Respondent declared: "These statements are false. After I established my Chinese business, I returned to Vietnam between 2006 and 2010 . . . . [¶] . . . [D]uring that time period, I invested approximately $20 million in charitable construction projects to build 5,000 homes for the poor as well as schools and bridges in Vietnam. [Bold omitted.] In addition, I invested approximately $30 million in a tourist enterprise to generate income and jobs in Vietnam's poorest province, Tien Giang." "I was not 'enticed' or lured by acquaintances or government officials to make ill-advised or foolish investments of $6 million which were eventually 'wiped out' . . . ." "I did not retain any houses when I left Vietnam at the end of the 2006-2010 time period."

3. Communist China and Vietnam have produced a "'sickening culture'" where the people "have merely tried to make a lot of money, regardless of the laws, regardless of social ethical conducts, regardless of familial morality . . . . And since then 'pettily cunning' tricks, 'strokes made famous,' and 'deceptions' have been omnipresent." "[Respondent] did business in such society for many years; therefore, in his eyes such things are normal, like using a girl as young as his grandchild, turning her into 'a lover' and then 'saying goodbye.' . . . [H]e used pictures and events of himself and this girl in an attempt to produce 'crowd effects' with the purpose of advertising his herbal products." Respondent's "style of 'playing' is . . . merely indicative of a kind of 'sickening culture' in those countries where he used to do business for many years and was so influenced."

Respondent declared: "The Article . . . falsely claims that I have adopted the 'sick culture' of the Chinese and Vietnamese

5

communist regimes . . . ."  "I have always been an upstanding, law-abiding businessman who accumulated his wealth from decades of hard work and ingenuity, and not through illegal tricks and deceptions or communist ties."  The statements about the girl "refer to model and actress Ngoc Trinh, with whom I had a brief romantic relationship and with whom I was genuinely in love with.  I did not use, exploit or attempt to use or exploit Ngoc Trinh, my relationship or our break up for publicity.  Nor did I exert improper pressure on Ngoc Trinh to become romantically involved with me, or say 'goodby' and throw her away, to promote my products."

4. Billionaires such as Warren Buffet and Bill Gates have used their fortunes to benefit mankind.  "Besides creating hundreds of thousands of jobs in the world, they always search for long-lasting values for mankind, instead of using 'maneuvers' like [respondent.]"  Even "El Chapo," the notorious Mexican drug dealer, "built free schools and free hospitals for the poor."  Respondent and other named Vietnamese persons[3] "are merely individuals creating wealth through 'relations' with government officials, enriching themselves by the so-called merchant's 'petty smart,' but not getting rich by the heart of someone who knows how to contribute long-lasting values to society.  That's why when they disappear from society, what they receive will only be the kinds of no good 'reputation,' such as 'dirty old man,' 'pettily cunning,' 'crook,' or 'miserly.'  They will not [be] able to leave behind everlasting good reputation."

---

[3] The other persons are "Pham Nhat Vuong, Dr. Thanh," and "Cuong 'Dollar.'"  The article contains no information about these persons.

Respondent declared: "None of these statements are true. I . . . [have] made tens of millions of dollars in charitable investments and donations to charitable causes in Vietnam and the United States. It is extremely important to me that I continue to give back to society . . . and leave a legacy of having lived a respectable life built on hard work, generosity, and benevolence." Respondent's complaint alleges: "In 2015, [respondent] set a new record when he donated $1 million to Auction Napa Valley's Fund-A-Need effort, a fundraiser to improve the lives of those who live year-round in Napa Valley. In 2017, [he] donated $5 million to flood victims in San Jose, California, and another $5 million for Hurricane Harvey flood relief in Houston, Texas."

In response to respondent's complaint and declaration, appellant filed a declaration explaining his purpose in writing the article: "My purpose in writing the article was to make the point [that respondent] is famous among the Vietnamese people. He is a billionaire who made good in business by doing business in China, and then in Vietnam." In the article I "explain how [respondent] came to be rich and famous. . . . The point I was making was that the Communist system had corrupted him, as it corrupts everybody who comes in contact with it. . . . [T]he important part of the story . . . was his involvement with the Communists." "The moral of the article is that persons who do business with Communist governments may take on the culture of those they do business with." "[T]he theme is that repressive Communist regimes create an immoral environment where 'the people . . . have merely tried to make a lot of money, regardless of the laws, regardless of social ethical conducts, regardless of familial morality, as long as money is being made.' In other

7

words, don't do business in Communist countries." "[M]y intent was not to gratuitously criticize [respondent], but to show the evil of the Communist regimes in China and Vietnam. . . . The purpose of [the] article[] was to express my opinion about the regimes."

As to Ngoc Trinh, the model and actress, appellant declared: "She is a well-known figure in the Vietnamese community. At the time [respondent] had an affair with her, he was 72 and she was in her twenties. All the Vietnamese newspapers covered it." The press in Vietnam gave "massive coverage . . . to his affair with the younger woman."

Appellant continued: "I based much of the article on a conversation I had with a close friend, Mai Lynh, who was [respondent's] younger brother. As the article states, Mai Lynh . . . recently passed away."[4] "I believed everything in the article was true."

*The Anti-SLAPP Statute*

"A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. [Citation.] The Legislature enacted Code of Civil Procedure section 425.16— known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055-1056.) Section 425.16, subdivision (a) provides that "this section shall be construed broadly" to "encourage continued participation in matters of public

---

[4] Appellant said that "Mai Lynh" was a "nickname." The brother's true name was "Hoang Huu Ly."

significance" and to assure "that this participation [shall] not be chilled through abuse of the judicial process."

Section 425.16, subdivision (b) provides in relevant part: "(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of . . . free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.  [¶]  (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

Section 425.16, subdivision (e) provides in relevant part, "'[A]ct in furtherance of a person's right of . . . free speech . . . includes: . . . (3) any . . . writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest."  "[B]oth the third and fourth categories of conduct that fall within section 425.16 are subject to the limitation that the conduct must be in connection with an issue of public interest.  The Legislature intended this requirement to have a limiting effect on the types of conduct that come within the third and fourth categories of the statute." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 (*Weinberg*).)

"'To prevail on an anti-SLAPP motion, the movant must first make "'a threshold showing that the challenged cause of action' arises from [protected activity] in connection with a public

9

issue [the first prong]." [Citation.] Once the movant meets this burden, the plaintiff must demonstrate "'a probability of prevailing on the claim [the second prong].'" [Citation.] If the plaintiff cannot meet this burden, the trial court must strike the cause of action. [Citation.]'" (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 80.)

*The Granting of BBC's anti-SLAPP*
*Motion and Denial of Appellant's Motion*

Appellant's codefendant, BBC, filed an anti-SLAPP motion. In December 2018 the trial court granted the motion. The trial court expressly found that BBC had satisfied the anti-SLAPP statute's first prong, i.e., it had made a threshold showing that respondent's causes of action arose from protected activity in connection with an issue of public interest. It also found that respondent had failed to satisfy the second prong because he had not demonstrated a probability of prevailing on his causes of action against BBC. The court explained: "[T]he law in California, and federal law, do not allow [respondent's] suit to proceed against the [BBC] Defendants who are not authors of the offending publication. . . . [T]here is a unique federal rule applicable to the internet which immunizes the re-publication of offending publications in public internet forums. (Communications Decency Act, 47 U.S.C § 230 . . . .)" The court dismissed the complaint against BBC and entered judgment in its favor.

After the trial court had granted BBC's anti-SLAPP motion, appellant filed his own anti-SLAPP motion. Appellant noted, "[T]he court has already granted an anti-SLAPP motion in favor of the BBC defendants on grounds that are applicable to [his motion]." The trial court ruled that appellant had failed to

10

satisfy the first prong of the anti-SLAPP statute.  The court rejected his claim that its ruling in the BBC proceeding collaterally estopped respondent from relitigating the first prong.  Even if appellant had satisfied the first prong, the trial court ruled that respondent had met his burden under the second prong by demonstrating a probability of prevailing on his causes of action against appellant.  The trial court therefore denied appellant's anti-SLAPP motion.

*Trial Court's Alleged Abuse of Discretion in Granting Appellant's Motion to File a Late Anti-SLAPP Motion*

Section 425.16, subdivision (f) provides that an anti-SLAPP motion "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper."  Respondent contends that the trial court abused its discretion in permitting appellant to file a late anti-SLAPP motion.

"A trial court's ruling on an application to file a late anti-SLAPP motion is reviewed for an abuse of discretion."  (*Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 782.)  "'"The burden is on the party complaining to establish an abuse of discretion . . . ."'"  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.)

Respondent argues, "Appellant waited over a year to file his anti-SLAPP motion and his only reason for the delay is that he believed, without reason, that his former co-Defendant [BBC] was representing him in this matter and thus voluntarily declined to answer or otherwise respond to the Compl[ai]nt. . . . [T]his is not a compelling reason [record citation], and Respondent has been greatly prejudiced by this unwarranted delay."

11

Respondent has failed to carry his burden of showing that, in permitting the late filing, the trial court exceeded the bounds of reason. (*Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464, 479 ["A trial court's exercise of discretion is abused only when its ruling "'exceeds the bounds of reason'""].) Appellant gave a plausible excuse for his delay in filing the anti-SLAPP motion. He declared that, upon receipt of the summons and complaint, he told "the Chief of Staff for the Vietnamese language Department of BBC World Service" that he "had no attorney." Appellant believed that BBC would represent him because the Chief of Staff replied that "BBC's attorney is working on the law suit and that they may contact me for information." Appellant also believed that BBC "would defend me in this matter [because] I affiliated with BBC by means of submitting my written articles for BBC to post on its website since 2012. Also, I have received payments from BBC for work submitted." Respondent has not shown that the late filing of the anti-SLAPP motion prejudiced his ability to defend against the motion.

*Standard of Review for Ruling on Anti-SLAPP Motion*

"A ruling on a section 425.16 motion is reviewed de novo. [Citation.] We review the record independently to determine whether the asserted cause of action arises from activity protected under the statute and, if so, whether the plaintiff has shown a probability of prevailing on the merits." (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 675.)

*Appellant Satisfied the First Prong of the Anti-SLAPP Statute*

Respondent maintains that appellant "did not satisfy the First anti-SLAPP prong [because] the article did not concern a matter of public interest." (Bold and capitalization omitted.) Section 425.16 "does not provide a definition for 'an issue of

12

public interest,' and it is doubtful an all-encompassing definition could be provided. However, the statute requires that there be some attributes of the issue which make it one of public, rather than merely private, interest. (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1132.) "[I]n each case where it was determined that a public issue existed, 'the subject statements either concerned *a person or entity in the public eye* [citations], conduct that could directly affect a large number of people beyond the direct participants [citations] or a topic of widespread, public interest [citation].'" (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736-737, italics added; see also *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 145 (*FilmOn.com*) ["In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or entity in the public eye'"].)

Exercising our independent review, we conclude that the article concerned a matter of public interest because respondent was "in the public eye" in the Vietnamese community. As to the first prong, we agree with the trial court's reasoning in its ruling granting BBC's anti-SLAPP motion. In determining that BBC had made the requisite threshold showing of the first anti-SLAPP prong, the trial court wrote: "RAAS Shanghai [the company that respondent cofounded] is a $14.5 billion-corporation, with major influence throughout Asia. [Respondent] promotes his business in media interviews and online posts. [He] has a Facebook page where he identifies himself as a 'public figure.' He uses his position to influence public opinion about his business. . . . By [respondent's] own allegations, the [article] drew thousands of comments, shares, and 'likes.'" (Citations omitted.) The trial court noted that, in *Tamkin v. CBS Broadcasting, Inc.* (2011) 193

13

Cal.App.4th 133, 143, the appellate court had concluded that an episode of a television show concerned "an issue of public interest because the public was demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode."

The comments to the article corroborate appellant's declaration that respondent had gained notoriety in the Vietnamese community through media coverage of his relationship with Ngoc Trinh. Relevant comments (translated from Vietnamese to English) include: "I was kinda mad at [respondent] for announcing the breakup [with Ngoc Trinh] along with his blatant, shameless advertisement. But then on the evening show, upon seeing him wear flowery pants and monkey jacket, my emotion changed from being mad to feeling sorry." "[H]is girlfriend was as young as his granddaughter. He shouldn't have announced the breakup and used it to advertise his products." "Prior to the news about [respondent] and Ngoc Trinh, I hadn't known who [respondent] was. I've seen Ngoc Trinh's info because tabloids usually lifted her skirts up." "Previously, no one knew who [respondent] was; after getting involved with Ngoc Trinh, the queen of underwear, his fame is rocketing up. Even during the reception of [Ngoc Trinh] visiting his family, he didn't forget to advertise his 5 bottles of wine." "I don't pay attention to who [respondent] is when he's getting famous with hot girls, models, being a playboy, and showing off wealth." "I think [respondent] does good PR for himself because everybody knows him." "[W]hen the famous people want to increase their sphere of influence or promote their images they use the media. In this case, [respondent] uses scandal, marrying

14

a young wife and divorcing in a short period of time and then advertising his company products!  Just like Trump's participation in The Apprentice before running for WH [White House] Presidency."  "I personally don't understand why this newspaper, that station keep running news all day about [respondent] and Ngoc Trinh? . . .  [T]he media wastes a lot of ink and paper painting them.  I want to stop following the news websites discussing this unworthy stuff of the stars."

It appears that, through his enormous wealth and affair with a much younger, glamorous, and famous actress/model, respondent achieved the status of a celebrity in the Vietnamese community.  "'[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities.  Certainly, the accomplishments and way of life of those who have achieved a marked reputation or notoriety by appearing before the public . . . may legitimately be mentioned and discussed in print . . . .'  [Citation.]  Thus, a celebrity has relinquished "'a part of his right of privacy to the extent that the public has a legitimate interest in his doings, affairs or character.'"'  (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 422.)

"Like the SLAPP statute itself, the question whether something is an issue of public interest must be ""construed broadly."'  [Citations.]  An ""issue of public interest"'" is "*any issue in which the public is interested.*"'"  (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 464-465.)  In its ruling granting BBC's anti-SLAPP motion, the trial court correctly concluded:  "The content of the publication at issue, the attention and commentary it provoked, along with

[respondent's] status, clearly justify a finding that the offending publication in this case was a matter of public interest." (See *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 695 (*Summit Bank*) ["The fact that Rogers's posts drew numerous comments, including comments vehemently disagreeing with Rogers, suggests that the [topics discussed in the posts] are matters of public discourse and are of considerable public interest"].)[5]

In ruling on appellant's anti-SLAPP motion, the trial court made a complete turnabout from its position in the BBC proceeding. It denied the motion because it erroneously concluded that appellant had "not adequately evidenced that his claims against [respondent] involved a topic of widespread public interest or that the statements contributed to the public debate." Although the article concerned an issue that was of interest only to the Vietnamese community, it concerned "an issue of public interest" within the meaning of section 425.16, subdivisions (e)(3) and (e)(4). (See *Traditional Cat Assn., Inc. v. Gilbreath* (2004)

---

[5] Some of the comments to appellant's article vehemently disagreed with him: "This article is based on a unique example of a particular person to bad mouth the entire regime; more broadly, to defame the dignity of millions of people living under that regime. It's an inciting, disparaging article." "[Respondent] makes money in the field of blood banks, which requires advanced, modern technology. How can you say that he's created wealth by petty cunning of merchants? The article displays immaturity and accusation." "Everything is being blamed on communism. Look at yourself first. You don't behave well but still blame on the regime. The author should have been objective." "I think BBC should remove this article right now. . . . Clearly, the right of free speech is being exploited to overthrow the government."

118 Cal.App.4th 392, 397 ["Web site statements" satisfied first prong because they "concerned matters of public interest in the cat breeding community"].)

In *FilmOn.com*, *supra*, 7 Cal.5th at p. 150, our Supreme Court concluded "that 'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.'" In determining whether the statement contributed to the public debate, "[w]e are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id*. at p. 151.) The numerous comments to the article show that appellant participated in and furthered the discourse that made respondent, his accumulation of wealth, and his relationship with Ngoc Trinh a subject of public interest within the Vietnamese community.

*Collateral Estoppel*

Respondent is collaterally estopped from claiming that the article did not concern an issue of public interest because this issue was decided against him in the prior BBC proceeding. Collateral estoppel, also known as issue or claim preclusion, "'is one aspect of the broader doctrine of res judicata. [Citation.] "Where res judicata operates to prevent relitigation of a cause of action once adjudicated, collateral estoppel operates . . . to obviate the need to relitigate issues already adjudicated in the first action. [Citation.] The purposes of the doctrine are said to be 'to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine

17

the integrity of the judicial system, [and] to protect against vexatious litigation."" [Citation.] [¶] "'Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].' [¶] It is implicit in this three-prong test that only issues actually litigated in the initial action may be precluded from the second proceeding under the collateral estoppel doctrine. . . . An issue is actually litigated '[w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined . . . .'"" [Citation.] Courts also consider whether the party to be estopped had a 'full and fair opportunity' to litigate the issue." (*Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 147-148 (*Gottlieb*).) Moreover, the determination of the litigated issue must have been "'essential to the judgment.'" (*People v. Sims* (1982) 32 Cal.3d 468, 491, fn. 1.)

All of the elements of collateral estoppel, as to the first prong, have been satisfied. The issue was identical in BBC's and appellant's anti-SLAPP motions. The issue was necessarily decided in the BBC proceeding and was essential to the judgment in BBC's favor. The trial court could not have granted BBC's anti-SLAPP motion unless it found that appellant's statements in the article had been made "in connection with an issue of public interest." (§ 425.16, subd. (e)(3).) In its ruling the trial court declared, "Since the [BBC] defendants have satisfied their initial burden under prong one, the burden shifts to [respondent] to demonstrate a probability of prevailing on his claims." The BBC

18

proceeding resulted in a final judgment on the merits. Both appellant's and BBC's anti-SLAPP motions were directed against the same party. Respondent "had a 'full and fair opportunity' to litigate the [first-prong] issue[s]" in defending against BBC's anti-SLAPP motion. (*Gottlieb*, *supra*, 141 Cal.App.4th at p. 148.)

A similar situation occurred in *Direct Shopping Network, LLC* v. *James* (2012) 206 Cal.App.4th 1551. There, James wrote allegedly defamatory articles about plaintiff. Interweave, a magazine publisher, republished one of the articles and quoted extensively from James's other articles. The plaintiff sued James and Interweave for defamation. Both defendants filed anti-SLAPP motions. Interweave's motion was heard first. The trial court denied Interweave's motion, but the denial was reversed on appeal and a final judgment on the merits was entered in favor of Interweave. The trial court subsequently conducted a hearing on James's anti-SLAPP motion. It permitted the plaintiff to introduce new evidence that had not been introduced at the prior hearing on Interweave's motion. Based on the new evidence, the trial court denied James's anti-SLAPP motion. James appealed. The appellate court reversed. It applied the doctrine of collateral estoppel to bar the plaintiff from relitigating issues that had been determined in the litigation of Interweave's anti-SLAPP motion. The appellate court reasoned: "The purpose of collateral estoppel is to prevent a party from repeatedly litigating an issue in order to secure a different result. [Plaintiff] had a full and fair opportunity to litigate the relevant issues when it opposed Interweave's motion and again when it opposed James's. It was not entitled to use our opinion [in Interweave's appeal] as a roadmap for curing the evidentiary deficiencies in its showing. In

19

short, we find no inequity in applying collateral estoppel to bring this litigation to a close."  (*Id*. at pp. 1562-1563.)

*Second Prong of Anti-SLAPP Statute*

"Despite the fact [appellant] . . . made a threshold showing that [respondent's] action is one arising from statutorily protected activity, [respondent] may defeat the anti-SLAPP motion by establishing a probability of prevailing on [his] claim." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 95.)  Respondent's "second-[prong] burden is a limited one.  [He] need not prove [his] case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit' [citation].  At this stage, "'[t]he court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.'"'  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 891.)  "The plaintiff must demonstrate this probability of success with admissible evidence.  [Citation.]  '"The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence."  [Citation.]'"  (*Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 768 (*Laker*).)

*Probability of Prevailing on Cause of Action for Defamation*

"'"'The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.'"'"  (*Laker, supra*, 32 Cal.App.5th at p. 763.)  A published statement is defamatory if it "exposes any person to hatred, contempt,

20

ridicule, or obloquy, or . . . causes him to be shunned or avoided, or . . . has a tendency to injure him in his occupation."  (Civ.Code, § 45.)

"[W]e must determine [(1)] whether the statements that form the basis of a defamation claim . . . expressly or impliedly assert a fact that is susceptible to being proved false; and (2) whether the language and tenor is such that it cannot "'reasonably [be] interpreted as stating actual facts.'""  (*Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1001.)  The federal constitution "provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual.  [Citation.]  This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20.)

"[T]he question is not strictly whether the published statement is fact or opinion.  Rather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. [Citations.] . . . [S]atirical, hyperbolic, imaginative, or figurative statements are protected because 'the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact.'"  (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 (*Franklin*).)

The "totality of the circumstances test is used to determine whether the statement in question communicates or implies a provably false statement of fact.  [Citation.]  Under the totality of the circumstances test, '[f]irst, the language of the statement is examined.  For words to be defamatory, they must be understood

21

in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered.'" (*Franklin, supra,* 116 Cal.App.4th at p. 385.)

We analyze each of appellant's allegedly defamatory statements:

(1) Respondent became a billionaire by exporting blood from China to the United States. This is a false statement of fact, but it is not defamatory. Respondent asserts the statement is defamatory because it "falsely accuses [him] of illegally importing human blood from China into the United States. . . . To do so would have been a violation of the Code of Federal Regulations, Title 21, and a criminal act . . . ." Respondent notes that the importation of blood is unlawful without a "biologics license" issued by the Food and Drug Administration (FDA), and no such license was issued to him. Furthermore, China "outlawed the [exportation of blood] in 1998." Respondent argues, "The Article's false claim that [he] smuggled blood, and made his fortune from such illegal activity, is defamatory *per se.*"

The article does not say or suggest that respondent's importation of blood from China was illegal. Appellant declared: "My article did not accuse [respondent] of criminal activity. I am not aware that any of his activity with regard to blood is a criminal activity. In fact, if it were criminal activity, that would lessen the point of my article. My point is that *legitimate* businesses that do business in Communist countries assist in corrupting the culture of these countries by facilitating them."

The article "must be viewed from the perspective of the average reader of [the BBC Vietnamese Facebook Page], not . . . [an] expert [on the global blood trade] who might view [it] as conveying some special meaning. . . . '[T]he fact that some person

might, with extra sensitive perception, understand such a [defamatory] meaning cannot compel this court to establish liability at so low a threshold.'" (*Summit Bank, supra*, 206 Cal.App.4th at p. 699.) The average reader of the BBC Vietnamese Facebook Page would not know that the export of blood from China to the United States was illegal. In supplemental briefing in the trial court, appellant observed, "[T]he importation of blood is a big business. According to the website of one importer, AFC International, the United States exported $19.3 billion of total human or animal blood in 2015, and imported $12.4 billion."

(2) Respondent was "enticed by acquaintances and government officials to invest several millions dollars (perhaps 6 million USD). His investment was eventually wiped out, he had to run back to the U.S., and vowed to never make investment in Viet Nam, only to go there for fun." This is a false statement of fact but may not constitute actionable defamation if respondent is a public figure. (See *post*, pp. 28-31.)

(3) Respondent's character has been tarnished by the "sickening culture" of communist China and Vietnam. He therefore considers it "normal" to try "to make a lot of money, regardless of the laws, regardless of social ethical conducts, regardless of familial morality" and to engage in "'pettily cunning' tricks, 'strokes made famous,' and 'deceptions.'" Moreover, respondent alleges that appellant made "accusations that Respondent inappropriately 'used' a girl [Ngoc Trinh] as young as his grandchild in an inappropriate manner to promote his businesses."[6]

---

[6] Comments to the article (*ante*, pp. 14-15) show that other persons shared appellant's belief that respondent had used the

23

"[A] reasonable fact finder could [not] conclude [that these] statement[s] declare[] or impl[y] a provably false assertion of fact." (*Franklin, supra*, 116 Cal.App.4th at p. 385.)  The statements fall within the category of protected rhetorical hyperbole.  "'"[R]hetorical hyperbole'" [citation] or 'loose, figurative, or hyperbolic language' which would 'negate the impression that the writer was seriously maintaining' a proposition that was 'sufficiently factual to be susceptible of being proved true or false' is protected." (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 849; see also *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 27 ["'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection"]; *Schaecher v. Bouffault* (Va. 2015) 772 S.E.2d 589, 594 ["'language that is insulting, offensive, or otherwise inappropriate, but constitutes no more than "'rhetorical hyperbole"' is not defamatory"].)  "[N]othing in [these statements by appellant] suggested that the author was imparting knowledge of actual facts to the reader," except that appellant accurately reported that respondent had a brief love affair with a woman young enough to be his granddaughter. (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1177.)  Appellant was expressing his opinion that, by doing business in communist China and Vietnam for more than 20 years, respondent had imbibed the amoral, materialistic values of the "sickening culture" of these countries.

(4) Billionaires such as Bill Gates and Warren Buffet have made valuable contributions to society and "always search for

---

publicity generated by his affair with Ngoc Trinh to advertise his products.

long-lasting values for mankind, instead of using 'maneuvers' like [respondent]."  Respondent and other named Vietnamese persons "are merely individuals creating wealth through 'relations' with government officials, enriching themselves by the so-called merchant's 'petty smart,' but not getting rich by the heart of someone who knows how to contribute long-lasting values to society.  That's why when they disappear from society, what they receive will only be the kinds of no good 'reputation,' such as 'dirty old man,' 'pettily cunning,' 'crook,' or 'miserly.'  They will not [be] able to leave behind everlasting good reputation."  Respondent argues:  "The statement that [he] made his wealth through 'relations with government officials' is accusing him of bribery and corruption, and is therefore defamatory per se.  Calling Respondent a 'crook,' and 'pettily cunning' is also defamatory per se as it again accuses him of committing crimes."  "The gist of these statements is that Respondent is a dishonest individual who engages in criminal conduct."

The statements in question constitute protected rhetorical hyperbole.  Appellant's characterization of respondent "is clearly recognizable as opinion and could not reasonably be understood as a statement of literal fact."  (*James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 14; see *Fletcher v. San Jose Mercury News* (1989) 216 Cal.App.3d 172, 190-191 [newspaper reporter's statement that Fletcher "'was a crook and a crooked politician'" was "merely rhetorical and hyperbolic language.  [The reporter] was not charging Fletcher with a specific crime.  Instead, the statements were a broad, unfocused and wholly subjective comment"]; *Greenbelt Co-op. Pub. Ass'n v. Bresler* (1970) 398 U.S. 6, 14 ["even the most careless reader must have perceived that the word ['blackmail'] was no more than rhetorical hyperbole"];

*McGlothlin v. Hennelly* (D.S.C. 2019) 370 F.Supp.3d 603, 618 ["Hennelly's statements that McGlothlin is a 'crony capitalist,' a 'crook,' and a 'crooked owner' are all rhetorical hyperbole. They are not capable of being proven false or even properly defined"]; *Troy Group, Inc. v. Tilson* (C.D. Cal. 2005) 364 F.Supp.2d 1149, 1151, 1159 [investor's email, "Are these guys the biggest crooks on the planet or what?" "is precisely the type of 'broad, unfocused and wholly subjective comment' that courts have typically regarded as opinion"]; *Wood v. American Federation of Government Employees* (D.D.C. 2018) 316 F.Supp.3d 475, 488 ["the Court concludes that Mr. Nelson's use of the words 'gang member' and 'crook' to describe Plaintiff was non-actionable hyperbole"]; *Edwards v. Detroit News, Inc.* (Mich.App. 2017) 910 N.W.2d 394, 400 ["This Court has previously identified several categories of speech that fall within the constitutionally protected class of opinion speech, including . . . expressions of opinion that otherwise 'constitute no more than "rhetorical hyperbole" or "vigorous epithet,"' such as calling someone a 'crook' or 'traitor'"].)

5. "Even drug-trafficking 'billionaire' like 'El Chapo' – making money by illicit means – still built free schools and free hospitals for the poor." Respondent asserts: "The Article . . . attacked Respondent by falsely accusing him of being a billionaire that is comparable to the 'drug-trafficking "billionaire" like "El Chapo" – making money by illicit means. . . .'" "Comparing Respondent to a notorious drug smuggler further reinforces that the Article is clearly stating that he violated the law by importing blood into the United States . . . ." "[A]ffiliating Respondent to a known criminal such as El Chapo is a means to associate Respondent with criminal activity."

The reference to El Chapo must be viewed in its context: "If the young people actually take a look at the outside world, they will see that the deeds and legacy of modern civilization 'billionaires' are long lasting values for society and more for the community future, from the longstanding billionaires like Warren Buffet to contemporary ones such as Bill Gates, Mark Elliot Zuckerberg, and Tim Cook. Besides creating hundreds of thousands of jobs in the world, they always search for long-lasting values for mankind, instead of using 'maneuvers' like [respondent]. Even drug-trafficking 'billionaire' like 'El Chapo' – making money by illicit means – still built free schools and free hospitals for the poor. Their valuable legacies, regardless of doing business the 'honest way' or in the 'crooked manner,' all originate from a normal, basic educational system of civilized societies, not 'deviant' as the 'sickening culture' that has been guiding societies in Vietnam and China."

When viewed in its context, the reference to El Chapo is not defamatory. Appellant was not implying that respondent's business activities were comparable to El Chapo's criminal drug trafficking. Appellant was making the point that in "the outside world," i.e., the West, even a billionaire drug lord engaged in significant charitable work because he was the product of "civilized societies" not infected by the "sickening culture" of communist China and Vietnam.

6. The article "accuse[d] Respondent of being a communist," "one of the most serious and damaging accusations that can be made within the Vietnamese American community." "By falsely claiming that Respondent has unreservedly adopted principles of communist 'sick culture' and alleging that Respondent does business with, is associated with or aligns himself with

27

communists, the Article has the intended force and effect of painting Respondent as a corrupt communist himself."

Appellant did not accuse respondent of being a communist or "paint" him as a communist. Appellant noted that respondent does business in communist China and Vietnam. That he does business in communist countries does not make him a communist.

Thus, there is only one statement in the article that is not protectible rhetorical hyperbole and that declares or implies a provably false, defamatory assertion of fact: respondent was "enticed by acquaintances and government officials" to invest $6 million in Vietnam, but his investment was "wiped out," causing him "to run back to the U.S." and to "vow[] to never make investment in Viet Nam, only to go there for fun."

Because respondent attained celebrity status in the Vietnamese community, he was a public figure in that community. (See *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 351 ["In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts"]; *Waldbaum v. Fairchild Publications, Inc.* (D.C. Cir. 1980) 627 F.2d 1287, 1298, fn. 32 ["A well-known celebrity becomes a public figure"]; *Id*. at pp. 1294-1295 ["Fame . . . may bring close scrutiny that can lead to adverse as well as favorable comment. When someone steps into the public spotlight, or when he remains there once cast into it, he must take the bad with the good"].)[7]

_____

[7] We need not consider appellant's argument that a prior ruling in an Orange County Superior Court case "is res judicata on the issue of [respondent] being a public figure." (Italics and capitalization omitted.) In the Orange County case, respondent

28

"If the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence [citation], that the libelous statement was made with "'actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."' (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256 (*Reader's Digest Assn.*).) "'[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' . . . [¶]  The quoted language establishes a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue.  [Citation.]  This test directs attention to the 'defendants attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.'  [Citation.] [¶]  Although the ultimate issue is thus the good faith of the publisher, . . . a defendant cannot 'automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.  The finder of fact must determine whether the publication was indeed made in good faith. . . . [R]ecklessness may be found where there are obvious reasons to

_____

sued a Vietnamese newspaper for defamation.  The trial court granted the newspaper's anti-SLAPP motion.  The court found that respondent "is a public figure, or in the very least, a limited purpose public figure," so he must show that the allegedly defamatory statements were made with actual malice.

29

doubt the veracity of the informant or the accuracy of his reports.'" (*Id*. at pp. 256-257.)

Respondent has failed to carry his burden of establishing a probability that he can show by clear and convincing evidence that appellant acted with actual malice. Appellant declared under penalty of perjury that he had "based much of the article on a conversation I had with a close friend, Mai Lynh, who was [respondent's] younger brother." "Regarding the investments in Vietnam, I relied on newspaper coverage and Mai Lynh. Mai Lynh told me his brother had lost about six million dollars in Vietnam."

Respondent claims that Mai Lynh "was inherently untrustworthy and admittedly biased against Respondent. Appellant's malice is evidenced by his failure to earnestly verify the truth of his alleged defamations." In support of his claim, respondent cites authority to the effect that, "'[w]here the information is from a source known to be hostile to the subject against whom the material is to be used, failure to investigate the truth of the allegations solely received from this source may support a finding the publication has been made in wanton and reckless disregard of veracity.'" (Quoting from *Fisher v. Larsen* (1982) 138 Cal.App.3d 627, 640.) Respondent maintains that Mai Lynh "was known to be hostile to [him]."

Appellant had no reason to believe that Mai Lynh was untrustworthy because he was biased against or hostile toward respondent. Appellant declared that Mai Lynh had asked him to provide assistance in buying equipment for a club that Mai Lynh was planning to open in Saigon. Appellant "asked Mai Lynh why he didn't ask his brother [respondent] for money. Mai Lynh said his brother gave him food and a house, but never money. Mai

30

Lynh said his brother never helped him." That respondent had given Mai Lynh food and a house, but not money, does not show that "'there [were] obvious reasons to doubt the veracity of [Mai Lynh] or the accuracy of his reports.'" (*Reader's Digest Assn.*, *supra*, 37 Cal.3d at p. 257.)

*Probability of Prevailing on Respondent's*
*Remaining Two Causes of Action*

Respondent's second cause of action alleges a violation of the common law right of publicity. It claims that "the Defamatory Statements contained within the Article are calculated falsehoods by Defendants and, as such, are a cover-up or subterfuge for the unauthorized commercial appropriation of [respondent's] name, image and identity in the Article . . . ." A violation of the common law right of publicity "has four elements: (1) [the] defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." (*Cross v. Facebook, Inc.* (2017) 14 Cal.App.5th 190, 208; see *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 391 & fn. 2 (*Comedy III Productions*) [The common law right of publicity derives from the "'[a]ppropriation, for the defendant's advantage, of the plaintiff's name or likeness'"].)

Because the article concerned a matter of public interest and appellant did not act with actual malice, respondent cannot establish a probability of prevailing on the second cause of action. "[N]o cause of action [for common law misappropriation of a plaintiff's name or likeness] will lie for the '[p]ublication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it . . . .'"

31

(*Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793.)

Furthermore, respondent's celebrity status in the Vietnamese community bars the cause of action. "'[T]he right of publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals. Once the celebrity thrusts himself or herself forward into the limelight, the First Amendment dictates that the right to comment on, parody, lampoon, and make other expressive uses of the celebrity image must be given broad scope. . . .'" (*Winter v. DC Comics* (2003) 30 Cal.4th 881, 889.) "Giving broad scope to the right of publicity has the potential of allowing a celebrity to accomplish through the vigorous exercise of that right the censorship of unflattering commentary that cannot be constitutionally accomplished through defamation actions." (*Comedy III Productions, supra*, 25 Cal.4th at p. 398.) "What the right of publicity holder possesses is . . . a right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity." (*Id.* at p. 403.) In writing the article, appellant did not misappropriate the economic value of respondent's fame.

Respondent's third cause of action alleges a civil conspiracy "to defame [him] and misappropriate his name, image, likeness, and identity for [defendants'] advantage." "The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages." (*City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 211-212.) Respondent

has failed to establish a probability of prevailing on the third cause of action because he has not shown that appellant and another person agreed to commit a tortious act. He also has not shown damages.

*Disposition*

The order denying appellant's anti-SLAPP, special motion to strike is reversed. The matter is remanded to the trial court with directions to grant the motion and strike respondent's complaint. Appellant shall recover his costs on appeal.


YEGAN, J.

We concur:


GILBERT, P. J.


PERREN, J.

Kevin G. DeNoce, Judge

Superior Court County of Ventura

_____

Mark S. Rosen, for Defendant and Appellant.

King & Ballow and Richard S. Busch for Plaintiff and Respondent.

Filed 2/1/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| KIEU HOANG,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PHONG MINH TRAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B302608<br>(Super. Ct. No. 56-2018-00507910-CU-DF-VTA)<br>(Ventura County)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

   The opinion in the above-entitled matter filed on January 11, 2021, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


GILBERT, P.J.          YEGAN, J.          PERREN, J.